353 P.2d 393

**Maurine BROWN, Plaintiff-Appellant,**

**v.**

**Lawrence BROWN, Defendant-Respondent.**

**No. 8851.**

Supreme Court of Idaho.

June 22, 1960.

---

Johnson & Olson, Pocatello, for appellant.

Jones, Pomeroy & Jones, Lawrence S. Bogert, Pocatello, for. respondent.

McQUADE, Justice.

This is an appeal from an order modifying a decree of divorce with respect to custody of two minor children.

Maurine Brown, plaintiff-appellant, and Lawrence Brown, defendant-respondent, were married July 6, 1951. At that time Mrs. Brown had a minor daughter, Linda Sue, whom defendant subsequently adopted. Another daughter, Rebecca Ann, was born to the parties.

At the time of the hearing for modification of the decree, Linda Sue was six years old, and Rebecca Ann, four.

Plaintiff was granted a divorce from defendant September 25, 1957. The decree awarded plaintiff custody of the two girls from September 1 to June 1 each year, and gave defendant custody during the summer months.

Following the divorce, plaintiff made her home in California. Another child, a boy, was born to plaintiff in Oakland, California, March 31, 1958, approximately six months after the divorce. The birth certificate named one Kay Sakurada as the child's father. The certificate was signed "Maurine M. Sakurada."

Defendant remarried after the divorce. He and his present wife, Dorothy, went to plaintiff's home in Oakland June 12, 1958, to pick up the two girls to return them to defendant's custody for the summer, pursuant to the decree. Present at the home were the plaintiff, the two girls, Kay Sakurada and the baby.

On August 26, 1958, defendant filed his petition and supporting affidavit seeking full custody of the children. He stated in part plaintiff's relationship with Sakurada created an "unwholesome and improper" environment for the children.

At the hearing for modification of the decree, defendant testified the girls "looked pretty skinny" when he picked them up at plaintiff's home in California. He described their appearance:

"Q. What was their condition in respect to their cleanliness?

"A. Their hair was pretty filthy, couldn't hardly get a comb through it and their clothes was filthy also.

"Q. * * * what was their physical appearance in respect to bruises?

"A. After we got the children we took them to a service station and cleaned them up, they had bruises from all the way up the middle of their back to their knees, both of them."

Dorothy Brown testified in part:

"Q. Will you describe to the court the two minor girls' appearance, physical appearance at that time?

"A. They looked like they had been starved half to death, and they were filthy. When I went to clean them up, comb their hair I couldn't get a comb through it, it was so dirty. Their scalp was really dirty. * * *

" * * * my husband, Larry, took one, I took the other, cleaned them up and we bought clothes for them so we could take them to a restaurant to eat."

She testified both girls had bruises "on their backs and bodies and back of their legs." On cross-examination she said:

"A. They told me that Maurine and Kay both had used belts on them * * *."

Dorothy Brown further testified she was willing to take the children into her home

and care for them. She has no children of her own.

Plaintiff testified, on statutory cross-examination, when the Browns picked up the children

"A. Their hair was combed, they had on pedal-pushers and T-shirts, playing, they had on a pair of sandals, just a normal child's play-clothes."

She further testified:

"Q. Did you ever beat them to a point where they were bruised?

"A. No, sir, I never did.

"Q. On their backs or legs?

"A. No, sir, I never did.

"Q. Mr. Sakurada ever do it?

"A. I refuse to answer on the ground my answer might tend to incriminate me."

In her rebuttal testimony, plaintiff denied she had ever neglected to feed the children.

Questioned about her relationship with Sakurada, plaintiff repeatedly refused to answer on the ground of self-incrimination.

A doctor examined the children June 16, 1958, immediately after their return to Idaho from California with the defendant. He testified Rebecca was then nine pounds underweight, and Linda 10 pounds underweight. He described the children as

" * * * not well nourished, they were certainly a little undernourished. * * *"

The trial court entered an order modifying the decree and awarding custody to the defendant, subject to reasonable visitation by the plaintiff. Plaintiff appeals from the order.

Plaintiff sets out eight specifications of error. Six of these assert error in the trial court's findings of fact, conclusions of law and order modifying the decree in respect to custody. Plaintiff asserts the trial court erred also in not sustaining a demurrer to the show cause order, in not granting various motions, and in excluding evidence to show defendant's failure to pay child support in full.

█ It is well settled in this State that in cases of this character the welfare and best interest of the minor children is the paramount consideration and that the children's welfare as normal human beings and future citizens is the polar star by which the court must be guided in awarding custody. Roosma v. Moots, 62 Idaho 450, 112 P.2d 1000; Maudlin v. Maudlin, 68 Idaho 64, 188 P.2d 323; Thurman v. Thurman, 73 Idaho 122, 245 P.2d 810, 32 A.L.R.2d 996.

█ Other considerations being equal, children of tender years can best be cared for by their mother. Nevertheless, it is not an abuse of discretion for the trial court to award custody to the father where he is better fitted to care for and educate them. Olson v. Olson, 47 Idaho 374, 276 P. 34; Maudlin v. Maudlin, supra.

█ There was ample evidence for the trial court to conclude that the children

were being physically abused and were not properly cared for by their mother. The court was correct in arriving at the conclusion that the children's welfare would best be served by a change in custody.

Plaintiff's counsel, in his oral argument, relies on the case of Daniels v. Daniels, Idaho, 351 P.2d 236,[1] decided by this Court April 1, 1960, wherein this Court held that adultery by the wife subsequent to divorce did not in itself justify reduction of alimony. The Daniels case involved only alimony; there was no question of the welfare of children. Without considering the nature of the relationship between plaintiff and Kay Sakurada, there is sufficient evidence to uphold the trial court's ruling.

■ Plaintiff cites error of the trial court in not sustaining her demurrer. Defendant's supporting affidavit sets out that Maurine Brown lived in an adulterous relationship with Kay Sakurada during the marriage, this not being known to defendant at the time the decree was entered; that a child was born to plaintiff and Sakurada six months after the divorce; that the environment in which the children were being reared was "unwholesome and improper." Defendant then asked for an order to show cause why the children should not be awarded to him.

The affidavit was sufficient to indicate a material permanent and substantial change in circumstances and condition of the parties since the decree of divorce. Maudlin v. Maudlin, 68 Idaho 64, 188 P.2d 323; Thurman v. Thurman, 73 Idaho 122, 245 P.2d 810.

We have examined the trial court's rulings on plaintiff's various motions, and find no ground for reversal therein.

■ Appellant's remaining contention is that the trial court erred in not allowing evidence to show the amount of support money actually paid by defendant. A receipt was introduced in evidence dated June 12, 1958; it showed payment was "for child support through June." The trial court refused an offer of proof by which plaintiff's counsel proposed to show defendant had not paid the full amounts due for child support during this time.

Even if it were shown defendant was in contempt for failure to pay, the "welfare of the children is, however, paramount to, and independent of," his situation. Brown v. Brown, 66 Idaho 625, 165 P.2d 886, 887. The trial court did not commit error in this regard.

The judgment of the trial court is affirmed.

Costs to respondent.

TAYLOR, C. J., and SMITH, KNUDSON and McFADDEN, JJ., concur.

1. Ante, p. 201.